CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
9/30/2026
LAURA A. AUSTIN, CLERK
BY: s/ C. Amos
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
LYNCHBURG DIVISION

MICHAEL DREW HUDSON & REBECCA MAE GOODSON,

*Plaintiffs,*

v.

COUNTY OF AMHERST, ET AL.,

*Defendants.*

CASE NO. 6:26-CV-00048

**MEMORANDUM OPINION & ORDER**

JUDGE NORMAN K. MOON

Plaintiffs Michael Hudson and Rebecca Goodson are domestic partners and residents of Amherst County, Virginia. Together, they bring ten claims against Amherst County and ten of its officials. Dkt. 1. Each claim concerns at least one of three grievances with the County: (1) its efforts to enforce its pet vaccination and licensing requirements, (2) a traffic stop of Hudson's farm use vehicle, and (3) its handling of Hudson's public records requests. *Id.* The Defendants filed motions to dismiss for failure to state a claim and lack of subject matter jurisdiction. Dkts. 9, 23, 26. For the following reasons, Defendants' motions will be granted and all Plaintiffs' claims will be dismissed.

## I. BACKGROUND

### *1. The Enforcement of State and Local Pet Licensing and Vaccination Rules*

Virginia law requires the owner of a dog or cat "four months of age and older" to "have such animal currently vaccinated for rabies." Va. Code § 3.2-6521(A). The owner is required to provide proof of vaccination "upon the request of an animal control officer, humane investigator, law-enforcement officer," or other qualifying official. *Id.* Additionally, state law requires dogs older than four months to be licensed. *See id.* § 3.2-6524. The issuance of a license is conditioned

on proof of vaccination for rabies (*id.* § 3.2-6526), and the license (a metal tag) must be displayed on the dog's collar, with limited exceptions. *Id.* § 3.2-6531. Violations of the licensing and vaccination rules are punishable as Class 4 misdemeanors. *See id.* § 3.2-6587(A).

Virginia law also compels local governments to regulate the ownership and care of dogs. Relevant here, municipalities are directed to "maintain . . . a public animal shelter and [to] require dogs running at large without the tag required by § 3.2-6531 . . . to be confined therein." *Id.* § 3.2-6546; *see also id.* § 3.2-6562 (requiring local officers "to capture and confine any companion animal of unknown ownership found running at large on which the license fee has not been paid"). Unlicensed dogs found running at large are to "be kept for a period of not less than five days . . . unless sooner claimed by the rightful owner" and, at the discretion of the animal shelter's operator, vaccinated for rabies. *Id.* § 3.2-6546(C). But Virginia law also empowers local governments to "adopt, and make more stringent, ordinances that parallel" the aforementioned rules. *Id.* § 3.2-6543.

The County of Amherst exercised its authority to adopt "more stringent" rules by elevating the penalty for the ownership of an unlicensed or unvaccinated dog to a Class 1 misdemeanor, (*see* Amherst County, Va., Code §§ 3-22, 3-42), and conditioning the release of an impounded unlicensed or unvaccinated dog on "proof of ownership, vaccination, and payment of the cost of impoundment" (*id.* § 3-38(b)). The Amherst County Animal Care Center ("Care Center") handles impounded dogs and "falls under the Administrative Division of the Amherst County Sheriff's Office."[1] Amanda Aguirre serves as the County's Master Deputy of Animal Control (Dkt. 1 ¶ 22), a law enforcement officer tasked with enforcing state and local animal welfare laws. *See* Amherst

---

[1] *Animal Care Center*, Amherst Cnty., Va., https://www.countyofamherst.com/department/index.php?structureid=24.

County, Va., Code § 3-3. However, the rabies vaccination rules specifically are enforceable by *all* law enforcement officers in the County. *Id.* § 3-41.

Plaintiffs owned an unlicensed and unvaccinated dog, Bolt. *See* Dkt. 1 ¶ 109. Plaintiffs also had a habit of letting Bolt roam at large, evinced by his three impoundments. *See id.* ¶¶ 109–114; *see also id.* ¶¶ 128, 144–148 (detailing when Bolt went missing for a fourth time and was picked up by a neighbor). The Care Center agreed to released Bolt without vaccination after the first two impoundments. *Id.* ¶¶ 109–111. But after the second impoundment, Plaintiffs were given an ultimatum by Aguirre: come into compliance within ten days or be charged for the violations. *See id.* ¶¶ 110–111. Despite Plaintiffs' continued refusal, Aguirre declined to bring the charges. *Id.*

On February 8, 2025, Goodson went to retrieve Bolt after his third impoundment. *Id.* ¶ 116. This time, Pamela Davis (Care Center Manager) and Sheriff's Deputy William Cheek refused to release Bolt unless Goodson affirmed, by signature, that he would be vaccinated within ten days; charges were again threatened if Goodson refused to comply. *See id.* ¶¶ 116, 125–126. Goodson signed and left with Bolt. Again, Plaintiffs ignored the ultimatum, yet charges were not filed after ten days had passed. *See id.* ¶ 127, 149.

On March 12, 2025, Hudson arrived at the Care Center with a public records request and a "constitutional objection letter" challenging the legality of the threatened enforcement. *Id.* ¶ 129. The next day, Deputy Ryan Mayhew appeared at Plaintiffs' residence to serve Goodson with a summons for the violations. *Id.* ¶ 131. Because Goodson was not home, Deputy Mayhew left; when he returned the next day, both Plaintiffs were handed criminal summonses for violations of the license and rabies vaccination ordinances. *Id.* ¶ 132.

On March 28, Plaintiffs vaccinated Bolt and purchased a license, though they maintained their constitutional objections to the ordinances. *See id.* ¶¶ 149–150. Because Plaintiffs were now

in compliance, the Commonwealth's Attorney entered a *nolle prosequi*, and the charges were dismissed on July 3, 2025. *Id.* ¶ 154.

### *2. The Traffic Stop of Hudson's Farm Use Vehicle*

Vehicles used exclusively for agricultural purposes may either be registered or unregistered with the Virginia DMV. Registered farm use vehicles are eligible for substantial fee discounts. *See* Va. Code § 46.2-698(A). Unregistered farm use vehicles are exempt from state registration and, by extension, the insurance and inspection requirements. *See id.* §§ 46.2-665, 46.2-706, 46.2-1157. While both types must be used "exclusively for farm use," the rules are more permissive for registered farm use vehicles. For instance, registered farm use vehicles may be driven for several "nonfarm use[s]." *Id.* § 46.2-698(B)(2). By contrast, the use of unregistered farm use vehicles is strictly confined to seven specific agricultural purposes (*id.* § 46.2-665(B)) and several other "intrinsically farm-related activities" covered by single-use exemptions. *Shifflett v. Commonwealth*, 58 Va. App. 731 732, 739 (2011). *See generally id.* at 737–40 (discussing Virginia's farm use vehicle laws).

Hudson owns an unregistered Dodge Ram 3500 for farm use. Dkt. 1 ¶¶ 52, 69. On October 23, 2024, he was driving his truck (and attached farm use trailer) to the Tractor Supply store in Amherst County. *See id.* ¶ 48. Unregistered farm use vehicles are permitted to operate "along a highway for a distance of no more than 75 miles for the purpose of obtaining supplies for agricultural or horticultural purposes." Va. Code § 46.2-665(B)(6). Along the way, Deputy Derek Tyree observed Hudson stop at a gas station and leave without purchasing gas. Dkt. 1 ¶ 49. Deputy Tyree relayed this information to Deputy Sergio Sanchez, who stopped Hudson in the Tractor Supply parking lot. *Id.* ¶ 50.

Deputy Sanchez asked for Hudson's license and registration; Hudson objected to the basis for the stop and refused to provide any identification. *See id.* ¶¶ 51–57. After some back and forth,

Hudson asked to speak to Lieutenant James Davidson, who had recently arrived at the scene with Deputy Falon Muffaletto. *Id.* ¶¶ 58–59. Lieutenant Davidson told Hudson that, with farm use tags, "you can't stop and do anything but drive to and from the farm." *Id.* ¶ 61. When Hudson questioned the reason for that suspicion, Lieutenant Davidson told him about the observation at the gas station. *Id.* ¶¶ 62–63. Hudson then agreed to exit the vehicle. *Id.* ¶ 67. Lieutenant Davidson again asked for Hudson's license and registration; Hudson provided his driver's license but could not produce any registration documents because his truck was unregistered. *See id.* ¶¶ 69–71.

Deputy Sanchez then spoke with Lieutenant Davidson and admitted, "I got nothing here," and suggested that they, "Cut [Hudson] loose."[2] *Id.* ¶ 75–76. Lieutenant Davidson suggested that they first "run the VIN" to "[m]ake sure [the truck] ain't stolen." *Id.* ¶ 77. Hudson—now back in his truck—was asked to exit again so that Deputy Sanchez could check the VIN inside the door jamb. *Id.* ¶ 79. Hudson again refused. *See id.* ¶¶ 79–81. During the dispute over the VIN, Lieutenant Davidson and Deputy Muffaletto each called the local Commonwealth's Attorney to inquire whether Hudson could be lawfully ordered out of the vehicle. *See id.* ¶¶ 84–85. Eventually, Hudson opened his door and allowed the deputies to check his VIN. *Id.* ¶ 88. After running the VIN and confirming Hudson's ownership of the truck, Hudson was released without citation; the entire stop lasted approximately twenty minutes. *Id.* ¶¶ 88–89.

***3. Plaintiffs' Public Records Requests***

The Virginia Freedom of Information Act ("VFOIA") grants the citizens of the Commonwealth a statutory right to access certain public records. *See* Va. Code § 2.2-3700 *et seq.* Hudson "regularly exercises his rights" under VFOIA. Dkt. 1 ¶ 2. Three of Hudson's requests are at issue in this case.

---

[2] Plaintiffs allegedly have bodycam footage to corroborate these allegations.

Following Hudson's October 23, 2024, traffic stop, he submitted a VFOIA request to the Sheriff's office, seeking bodycam and dashcam footage from the stop, among other records. *See id.* ¶ 90. On November 15, 2024, Major James Begley called Hudson and told him that his request would cost "far, far in excess of $50." *Id.* ¶ 92. Hudson then submitted a second, narrowed request on November 18. Four days later, the Sheriff's Office provided some of the requested records, but said that those relating to the targeting of farm use vehicles did not exist. *See id.* ¶¶ 95, 97. Hudson appealed this response. *Id.* ¶ 100. Lastly, Hudson delivered a third VFOIA request to the Care Center on March 12, 2025, seeking records relating to the impoundment of Bolt and the handling of other animals. *See id.* ¶ 129–130. It was the following day (March 13) that Deputy Ryan Mayhew delivered the criminal summons at Plaintiffs' residence. *Id.* ¶ 131.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has stated a claim such that the court can grant relief. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint "does not need detailed factual allegations" to survive a 12(b)(6) motion; however, a plaintiff must provide "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Plaintiff's allegations must be taken as true, and all reasonable inferences must be drawn in the plaintiff's favor during 12(b)(6) motions to dismiss. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

Because Plaintiffs are proceeding *pro se*, their complaint must be construed liberally. *See, e.g.*, *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). However, the Court will not draw inferences that are "unsupported by facts alleged in the complaint." *Green v. McHugh*, 793 F. Supp. 2d 346, 349 (D.D.C. 2011); *accord Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013).

## III. ANALYSIS

Plaintiffs Hudson and Goodson assert ten claims: (1) a *Monell* claim against Amherst County for enforcing an allegedly *ultra vires* ordinance, Dkt. 1 ¶¶ 158–164; (2) an unlawful seizure claim against Officers Sanchez, Muffaletto, Davison, and Tyree for the traffic stop, *id.* ¶¶ 166–178; (3) a First Amendment retaliation claim against Begley, Davis, Aguirre, Mayhew, and Cheek for initiating the prosecution, *id.* ¶¶ 180–191; (4) an unlawful seizure claim against Cheek and Davis for taking Goodson's ID, *id.* ¶¶ 193–200; (5) an unlawful seizure claim against Davis and Aguirre for refusing to release Bolt without Goodson signature, *id.* ¶¶ 204–211; (6) a VFOIA claim against Begley and Aguirre, *id.* ¶¶ 213–219; (7) a First Amendment claim against Begley and Aguirre for their handling of Hudson's records requests, *id.* ¶¶ 221–225; (8) a claim against Sheriff Ayers to enjoin five ongoing alleged constitutional violations, *id.* ¶¶ 227–231; (9) a due process claim against Amherst County for enacting an allegedly unauthorized penal scheme, *id.* ¶¶ 233–239; and (10) a malicious prosecution claim against Aguirre, Davis, and Mayhew. The Court will address each in turn.

### 1. Count I: *Monell* claim against Amherst County

Count I asserts a § 1983 claim against Amherst County for allegedly enforcing dog vaccination and licensure ordinances in violation of Plaintiffs' constitutional rights. Specifically, Plaintiffs claim the ordinances exceed the scope of the County's delegated authority under state law and, therefore, that the enforcement of these ordinances against Plaintiffs deprived them of their Fourth and Fourteenth Amendment rights by exposing them to "criminal prosecution under

void legal authority," "unauthorized Class 1 penalties," and "coerced compliance through threat of incarceration under invalid law." *Id.* ¶ 162.[3]

Plaintiffs do not challenge the validity of the rules requiring them to obtain a license and vaccination for their dog, nor do they dispute the County's authority to "adopt more stringent requirements" than those existing at state law. *See id.* ¶¶ 29–38, 159, 161. Rather, Plaintiffs bring facial and as-applied challenges to the County's elevation of the *penalties* for violations of these rules from Class 4 to Class 1 misdemeanors.[4] *See id.* ¶¶ 159–161, 163–164; *id.* ¶ 159 ("While § 3.2-6543 authorizes more stringent substantive requirements, it does not authorize the enhancement of criminal penalties beyond those established by the General Assembly."); *see also* Amherst County, Va., Code § 3-22 (providing for Class 1 misdemeanor penalties for the failure to obtain a dog license); *id.* § 3-42 (same for the violation of any of the rabies vaccination rules).

First, Plaintiffs' as-applied challenge fails because they have not alleged that the enforcement of the ordinances violated any of their constitutional rights. The argument in Count I are based on Virginia's strict Dillon's Rule—the principle that the powers of municipalities are "fixed by statute and are limited to those conferred expressly or by necessary implication." *Bd. of Supervisors of Fairfax Cnty. v. Horne*, 216 Va. 113, 117 (1975) (citation omitted). But federal

---

[3] Count I also alleges "chilling of [Plaintiffs'] First Amendment rights through retaliatory prosecution under void ordinances." Dkt. 1 ¶ 162. Because this allegation is the basis of Counts III and X, it will be addressed in the analysis there.

[4] Plaintiffs also take issue with Section 3-36 (which makes it "unlawful to own" an unvaccinated dog), saying that it "criminaliz[es] the status of ownership," and is thus "in conflict with the conduct-based prohibition in Virginia Code § 3.2-6521" and County Code § 3-17 (which classifies dogs as "personal property"). *See* Dkt. 1 ¶ 160. Whether Section 3-36 criminalizes the *status* of owning an unvaccinated or the *conduct* of failing to vaccinate one's dog is of no consequence—the government may (and does) regulate the ownership of personal property even though it is lawful, in general, to own that property. For instance, just because it is lawful to own a firearm does not prevent the government from prohibiting the ownership of a firearm with an altered or destroyed serial number. *See* Va. Code § 18.2-311.1(B).

courts "have long recognized that 'a mere error of state law is not a denial of due process.'" *Swarthout v. Cooke*, 562 U.S. 216, 222 (2011) (quoting *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982)). Even if Sections 3-22 and 3-42 of the Amherst County Code are invalid as a matter of state law, more is needed to allege a deprivation of Plaintiffs' federal constitutional rights.

Plaintiffs argue that they have alleged "more" because they suffered the stresses associated with being charged with Class 1 misdemeanors that, in their view, should have been charged as Class 4 misdemeanors. *See, e.g.*, Dkt. 1 ¶¶ 162 (alleging "constitutional injuries" through "criminal prosecution under void legal authority," "exposure to Class 1 penalties," and "coerced compliance through threat of incarceration under invalid law"); *id.* ¶ 164 ("As a direct result [of the County's enforcement], Plaintiffs suffered deprivation of liberty, threats of incarceration, emotional distress, impact on their children, coerced expenditures, and chilling of First Amendment rights."). But Plaintiffs must identify "separate and distinct liberty deprivations as a result of the criminal charges" being brought, "other than being obliged to appear in court, experiencing stress, or feeling humiliated by the process." *Craft v. Gills*, 758 F. Supp. 3d 564, 571 (S.D. W. Va. 2024) (quotation omitted).

*Reyes v. City of Lynchburg* is illustrative on this point. There, the plaintiff brought a § 1983 claim for nominal damages after he was prosecuted under a local parade ordinance that was subsequently repealed by the city council. *See* 300 F.3d 449, 451–52 (4th Cir. 2002). Like Plaintiffs here, Reyes was charged but not convicted for the violation and argued that the mere initiation of charges under an unconstitutional ordinance violated his Due Process rights. *See id.* at 452–53, 456. Despite the court's finding that the ordinance, prior to its repeal, indeed violated the First Amendment, Reyes's claim was rejected because "there [is] no automatic § 1983 claim on account of prosecution under [an] invalid ordinance." *Id.* at 457. In other words, Reyes's due process claim

failed because he received all the process that was due: he was "charged in writing, permitted an opportunity to respond in open court, and vindicated by the dismissal of all charges." *Id.* at 456–57 (quoting *Richardson v. City of South Euclid*, 904 F.2d 1050, 1053 (6th Cir. 1990)).[5]

Here too, Plaintiffs received all the process they were due. They were served with notice of the prosecution and given an opportunity to be heard in court. *See LaChance v. Erickson*, 522 U.S. 262, 266 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard." (citation omitted)). And because the charges were dismissed, they suffered no injury beyond "being obliged to appear in court, experiencing stress, or feeling humiliated by the process." *Craft*, 758 F. Supp. 3d at 571 (quotation omitted); *accord Reyes*, 300 F.3d at 455 n.8. Neither the procedural nor substantive component of the Due Process Clause protects a right "to be free from criminal prosecution except upon probable cause." *R.M.B. v. Bedford Cnty. Sch. Bd.*, 169 F. Supp. 3d 647, 657 (W.D. Va. 2016) (citing *Albright v. Oliver*, 510 U.S. 266, 274–75 (1994); and *Taylor v. Walters*, 81 F.3d 429, 436 (4th Cir. 1996)).

Additionally, Plaintiffs fail to allege a violation of their Fourth Amendment rights because they were never "seized" between the service of the summons and the dismissal of the charges. *See, e.g.*, *Craft*, 758 F. Supp. 3d at 571 ("[A] groundless charging decision may abuse the criminal process, but it does not, in and of itself, violate the Fourth Amendment absent a significant restriction on liberty." (quotation omitted)); *Myers v. Shaver*, 245 F. Supp. 2d 805, 812 (W.D. Va. 2003) ("A summons to answer charges on a criminal complaint is not, by itself, a seizure under the Fourth Amendment." (citation omitted)); *Albright*, 510 U.S. at 289–91. Plaintiffs were not arrested or otherwise significantly restricted as to implicate the Fourth Amendment. And even if they were,

[5] The court also rejected Reyes's argument that his First Amendment rights were "chilled" by the prosecution. *See Reyes*, 300 F.3d at 455 n.8.

the seizure would have been supported by probable cause of violations of both state and local law. *See* Dkt. 1 ¶¶ 126–127, 149 (acknowledging their noncompliance with state and local licensing and vaccination rules); *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019) ("A seizure is unreasonable under the Fourth Amendment if it is not based on probable cause." (citing *Dunaway v. New York*, 442 U.S. 200, 213 (1979)).

Lastly, Plaintiffs' facial challenge to Sections 3-22 and 3-42 fails as well. To state a valid facial challenge to a statute, a plaintiff "must 'establish that no set of circumstances exists under which [the statute] would be valid or that the statute lacks any plainly legitimate sweep.'" *United States v. Gould*, 163 F.4th 795, 798 (4th Cir. 2026) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).[6] Therefore, if a plaintiff's as-applied challenge fails, their facial challenge must also fail. *See Mountain Valley Pipeline, LLC v. Hinz*, No. 7:24-cv-00352, 2025 WL 897556, at *9–10 (W.D. Va. Mar. 24, 2025) (citing precedent).

Accordingly, Count I fails to allege a violation of Plaintiffs' federal constitutional rights, and must be dismissed for failure to state a claim.[7]

**2. Count II: Unlawful Seizure Against Sanchez, Muffaletto, Davidson, and Tyree**

Count II asserts a § 1983 claim against Defendants Sanchez, Muffaletto, Davidson, and Tyree in their individual capacities for the allegedly unlawful traffic stop of Plaintiff Hudson's

6 A limited exception to this is the overbreadth doctrine, which supplies a more forgiving standard for First Amendment facial challenges. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 769 (2023). As stated above, however, the First Amendment injuries included in Counts I and IX stem from the allegedly "retaliatory prosecution" (Dkt. 1 ¶¶ 162–164) and are properly addressed in the analysis of Counts III and VII.

7 The Court expresses no view on the merits of Plaintiffs' argument that the ordinances violate Dillon's Rule. To the extent that Count I could be liberally construed to assert a separate state law claim, the Court declines to exercise jurisdiction and dismisses it without prejudice. *See Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 307 (4th Cir. 2021) ("[A] Dillon Rule claim does not necessarily raise a federal question."); 28 U.S.C. § 1367(c).

farm use vehicle. *See* Part I.2., *supra* (detailing the traffic stop). Plaintiffs allege five distinct Fourth Amendment violations: (1) the lack of reasonable suspicion to initiate the stop, (2) the lack of reasonable suspicion to prolong the stop to run the VIN, (3) the demand for Hudson's driver's license "without legal authority," (4) the "[p]retextual" safety justification to order Hudson out of the vehicle, and (5) the "[c]onsciousness of [u]nlawfulness" displayed by Defendant Davidson's mid-stop phone call to the Commonwealth's Attorney. *See* Dkt. 1 ¶¶ 167–172.

In analyzing a claim of unlawful search or seizure, it is helpful to proceed chronologically. *See United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) ("[The] Fourth Amendment search and seizure analysis unfurls chronologically . . . ."). Thus, the Court will analyze the alleged violations in the order that they occurred—starting with the initiation of the traffic stop, followed by the demand for ID, the VIN check, and finishing with the "[p]retextual safety justification" and call to the Commonwealth's Attorney. *See* Dkt. 1 ¶¶ 167–172.

i. *The Initiation of the Traffic Stop*

Only the alleged actions of Defendants Tyree and Sanchez are relevant to this inquiry. *See* Dkt. 1 ¶¶ 173–174. Traffic stops are analyzed under the framework of *Terry v. Ohio* because they are investigative rather than custodial in nature. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Therefore, the initiation of a traffic stop is lawful if it is supported by reasonable suspicion, *i.e.*, "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also United States v. Brugal*, 209 F.3d 353, 359 (4th Cir. 2000) (en banc) ("The reasonable suspicion determination does not depend upon any one factor, but on the totality of the circumstances." (citation omitted)). But many states, including Virginia, have exempted particular traffic violations from supporting a traffic stop by themselves. Thus, the legality of Deputy Sanchez's initial stop of Hudson depends

on two questions: whether Virginia law permits traffic stops based solely on a suspected farm use vehicle violation, and whether Deputy Tyree[8] had reasonable suspicion of such a violation.

The answer to each question is "yes." First, farm use vehicle violations are not among the list of traffic infractions that the Virginia General Assembly has exempted from justifying a traffic stop. *See* Va. Code §§ 46.2-1052, 46.2-1013, 46.2-1003, 46.2-1054. In fact, the willful and intentional misuse of an unregistered farm use vehicle is a traffic infraction subject to arrest and citation as a misdemeanor.[9] Accordingly, Virginia law permits police officers to initiate a traffic stop upon reasonable suspicion of the misuse of a farm use vehicle. *E.g.*, *Miller v. Parrish*, 2013 WL 1868028, at *6 (E.D. Va. May 2, 2013); *Shifflett v. Commonwealth*, 58 Va. App. 732, 738–40 (2011).

Second, Plaintiffs have put forth insufficient facts to establish that Deputy Tyree lacked reasonable suspicion of a farm use vehicle violation. Very few facts are alleged regarding the initial observation beyond that Deputy Tyree saw Hudson stop at a gas station with his unregistered farm use vehicle and leave without purchasing gas. *See* Dkt. 1 ¶ 49. In most circumstances, this behavior is entirely innocuous—but what is innocuous in some circumstances might be suspicious in others. *See, e.g.*, *United States v. Smart*, 91 F.4th 214, 223–24 (4th Cir. 2024). The scope of lawful use of an unregistered farm use vehicle is severely restricted under Virginia law; "[e]ach permissible use . . . presupposes the vehicle is being 'used exclusively for agricultural or horticultural purposes.'"

---

[8] Because Sanchez is alleged to have initiated stop based only on information relayed from Tyree, the relevant point of view is that of Tyree. *See United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011) ("The collective-knowledge doctrine . . . holds that when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself[.]").

[9] *Compare* Va. Code § 46.2-613(3) ("[It] shall constitute a traffic infraction . . . [to] [w]illfully and intentionally violate the limitations imposed under §§ 46.2-665 . . . ."), *with id.* § 46.2-937 ("For purposes of arrest, traffic infractions shall be treated as misdemeanors."), *and id.* § 46.2-936 (providing the procedure for arrest upon a traffic infraction).

*Shifflett*, 58 Va. App. at 739 (quoting Va. Code § 46.2-665(A)). A gas station is a commercial establishment without any connection to farm operations. More fundamentally, stopping at a gas station without purchasing gas does not correspond to any of the enumerated permissible uses. *See* Va. Code §§ 46.2-665–684. The most reasonable inference, therefore, was that Hudson was using the truck for an improper purpose. *See Shifflett*, 58 Va. App. at 738–40; *Miller*, 2013 WL 1868028, at *6 ("[T]he acceptable use of such an unlicensed 'farm-use' truck on a public roadway is allowed only under narrow, specifically enumerated circumstances. Virginia law does not provide a blanket exception for farmers to drive unlicensed vehicles on public roads for any purpose." (citation omitted)).

Plaintiffs repeatedly emphasize the apparent lawfulness of Hudson's trip. *See* Dkt. 1 ¶¶ 48, 53–55, 64–65. But whether or not Hudson was actually using his truck for a proper purpose is beside the point. Reasonable suspicion does not require certainty or even confidence that the suspected infraction in fact occurred. *See, e.g.*, *Kansas v. Glover*, 589 U.S. 380–81 (2020); *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014). To plausibly allege that the initiation of the stop was unlawful, Plaintiffs needed to have put forth sufficient facts that Deputy Tyree's belief that Hudson *may have* been using his truck for an improper purpose was unreasonable under the "totality of the circumstances." *Glover*, 589 U.S. at 386. Given the foregoing, they have failed to do so. The Complaint provides "no evidence that [Tyree] knew—or should have known—that the purpose of [Hudson's] travels fell within a farm-use exception." *Miller*, 2013 WL 1868028, at *7.

### ii. *The Demand for Identification*

Because "an initially permissible [] seizure may transform into an impermissible one by further intrusions not based upon individualized suspicion or consent," *Brugal*, 209 F.3d at 357 (citing *United States v. Brigoni-Ponce*, 422 U.S. 873, 881–82 (1975)), the Court will next consider

whether Deputy Sanchez and Lieutenant Davidson "demanded [Hudson's] identification without legal authority." Dkt. 1 ¶ 170.

Plaintiffs allege that Deputy Sanchez asked for Hudson's driver's license after pulling him over in the Tractor Supply parking lot. *Id.* ¶ 51. Hudson, believing the stop to be unlawful, refused to comply. *Id.* ¶¶ 53–57. Lieutenant Davidson arrived at the scene and, after Hudson's continued refusal to produce his license, asked him to exit the vehicle. *Id.* ¶ 66. Only then did Hudson hand over his license. *Id.* ¶¶ 67–68.

Plaintiffs' apparent understanding of the law is that they need not comply with a demand for identification during a traffic stop so long as they honestly believe that the stop is unwarranted. The argument seems to be that, because Hudson believed that his trip was lawful and that the officers were mistaken, he rightfully refused to produce his driver's license. *See id.* ¶¶ 56, 64–72.

This understanding is incorrect. First, Virginia law requires drivers to produce their driver's license during a traffic stop "on the officer's request . . . for the purpose of establishing his identity." Va. Code § 46.2-104; *see also Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 188 (2004) ("A state law requiring a suspect to disclose his name in the course of a valid *Terry* stop is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures."). Second, the Court has already determined that Plaintiffs failed to establish that reasonable suspicion for the stop did *not* exist, and it is well settled that the Fourth Amendment permits police officers to demand a suspect's driver's license during a lawful traffic stop. *See, e.g.*, *United States v. Hawkins*, 161 F.4th 242, 246 (4th Cir. 2025); *Rodriguez v. United States*, 575 U.S. 355–56 (2015). And third, even if Hudson was correct that Defendants were mistaken about the suspected misuse, he still would have been required to produce his license because such a mistake would have been reasonable under the alleged facts. *See Heien*, 574 U.S. at 60–61 (holding that

searches or seizures based on reasonable mistakes of fact or law do not violate the Fourth Amendment).

Plaintiffs' additional argument that Deputy Sanchez's alleged statement that Hudson "qualif[ied]" for the farm use exception ended any lawful basis for the stop is also incorrect. *See* Dkt. 1 ¶¶ 51–52. Sanchez's alleged remark was that, because Hudson's "truck is three quarter ton," he qualified for the exception. *Id.* ¶ 51. But this had nothing to do with the suspected non-agricultural use of Hudson's vehicle. A vehicle qualifies for the unregistered farm-use exception if it meets certain weight and classification criteria. *See* Va. Code § 46.2-665(B). But a qualifying vehicle is still subject to the use restrictions and placard requirement. *See id.* § 46.2-665(B)–(C). In other words, Sanchez's alleged admission that Hudson's truck qualified for the exception does nothing to suggest he lacked reasonable suspicion that Hudson had misused it.

Therefore, Plaintiffs have also failed to establish that Sanchez and Davidson unlawfully demanded his identification.

iii. *The VIN Check*

The next question is whether Defendants Sanchez and Davidson unlawfully prolonged Hudson's traffic stop by checking his Vehicle Identification Number (VIN). *See* Dkt. 1 ¶ 169. Plaintiffs allege that once Deputy Sanchez returned to his squad car and said to Lieutenant Davidson, "I got nothing here," the traffic stop should have ceased. *Id.* ¶ 75. Instead, Davidson allegedly directed Sanchez to "run the VIN" on Hudson's truck to "[m]ake sure it ain't stolen." *Id.* ¶ 76.

Plaintiffs argue that this conduct was unreasonable under the principle, reinforced in *Rodriguez v. United States*, that the lawfulness of a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed," absent additional reasonable suspicion. 575 U.S. 348, 354 (2015) (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985));

*accord* Dkt. 1 ¶¶ 166, 169. But *Rodriguez* also reinforced another principle: that there are certain "ordinary inquiries incident to the traffic stop," which typically "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355 (quotation and citation omitted). And "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop." *New York v. Class*, 475 U.S. 106, 115 (1986) (citing *Delaware v. Prouse*, 440 U.S. 648, 659 (1979)). So while police cannot extend a traffic stop beyond its ordinary scope without suspicion, these routine, traffic-safety-related inquiries are an integral part of that ordinary scope. *See, e.g.*, *Hawkins*, 161 F.4th at 246; *United States v. Perez*, 30 F.4th 369, 375 (4th Cir. 2022); *United States v. Hill*, 852 F.3d 377, 381–84 (4th Cir. 2017).

Hudson was stopped upon reasonable suspicion of the misuse of a farm use vehicle; the "mission" of the stop was therefore to: (a) investigate that suspected misuse, and (b) conduct the ordinary traffic-safety-related inquiries. *See Rodriguez*, 575 U.S. at 354 ("Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." (internal citations omitted)). Again, these "ordinary inquiries" are independent of the suspected traffic violation and are intended to ensure that the driver is lawfully operating the vehicle in general. *See id.* at 355 ("[The ordinary inquiries] serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." (citation omitted)).

The unique circumstances of Hudson's stop confirm the reasonableness of the VIN check. The VIN "uniquely identifies each vehicle and is required by law to be printed on each vehicle in

multiple locations." *United States v. Wallace*, 937 F.3d 130, 134 (2nd Cir. 2019) (citing 49 C.F.R. § 565.13); *see also Class*, 475 U.S. at 111–12 (discussing the importance of the VIN in "ensur[ing] that automobile operators are driving safe vehicles"). One of the "ordinary inquiries" cited in *Rodriguez* is to check the vehicle's registration. *Rodriguez*, 575 U.S. at 355. In Virginia (as in many states), the VIN is included on the vehicle's registration card,[10] so there is ordinarily less justification for police to check the VIN on the vehicle itself. Here, however, Hudson was driving an unregistered farm use vehicle—the officers had no other way to verify the identity or ownership of the truck without checking its VIN. In other situations where the registration card was unavailable or otherwise insufficient to verify identity and ownership of the vehicle, courts have consistently upheld brief extensions of traffic stops for officers to run the VIN.[11] Further, there are no facts to suggest that Deputy Sanchez was not diligent in this inquiry. In fact, much of the several-minute extension is attributable to Hudson's continued refusal to exit his vehicle. *See* Dkt. 1 ¶¶ 79–89. True, even a *de minimis* extension may constitute an unlawful prolongment, but "the holding in *Rodriguez* does not render unlawful a traffic stop in which there are brief periods unaccounted for, as long as the stop was not prolonged for purposes beyond the mission of the stop, and the officers executed their tasks with reasonable diligence." *Hill*, 852 F.3d at 383.

Plaintiffs allege insufficient facts to suggest that the VIN check was unreasonable, especially in light of the unique circumstances posed by a traffic stop of an unregistered farm use vehicle. *See Navarette v. California*, 572 U.S. 393, 397 (2014) ("The reasonable suspicion . . . .

---

[10] *See* Virginia Department of Motor Vehicles, *Sample Registration Card*, https://www.dmv.virginia.gov/vehicles/registration/sample-card.

[11] *Wallace*, 937 F.3d at 134–40; *United States v. Noble*, 114 F. App'x 562, 563–64 (4th Cir. 2004); *United States v. Stamper*, 2022 WL 1815510, at *5–6 (W.D.N.C. Jan. 6, 2022), report and recommendation adopted, 2022 WL 1815013 (W.D.N.C. June 2, 2022); *United States v. Curry*, 2010 WL 2858009, at *3 & n.1 (D. Md. July 19, 2010); *cf. United States v. Caro*, 248 F.3d 1240, 1246 (10th Cir. 2001).

standard takes into account the totality of the circumstances—the whole picture." (internal citation and quotation omitted)); *United States v. Dadisman*, 2025 WL 1513604, at *5 (4th Cir. May 28, 2025) (unpublished) ("Determining whether a traffic stop was impermissibly prolonged is a fact-specific inquiry.").

iv. *Pretextual Safety Justification & Consciousness of Unlawfulness*

Next, Plaintiffs assert that Deputy Muffaletto's allegedly pretextual safety justification to order Hudson to exit his vehicle for the VIN check, and Lieutenant Davidson's alleged consciousness of the stop's unlawfulness through his phone call to the Commonwealth's attorney, violated Hudson's Fourth Amendment rights. *See* Dkt. 1 ¶¶ 171–172, 175–176.

Both assertions relate to the officers' apparent subjective states of mind. But "an individual officer's subjective intentions are irrelevant to the Fourth Amendment validity of a traffic stop that is justified objectively by probable cause to believe that a traffic violation has occurred." *City of Indianapolis v. Edmond*, 531 U.S. 32, 45 (2000) (citing *Whren v. United States*, 517 U.S. 806, 810–13 (1996)); *accord United States v. Ordonez-Zometa*, 141 F.4th 531, 551 (4th Cir. 2025). First, as to Deputy Muffaletto, nothing in the Fourth Amendment required her to actually fear for her safety before asserting it as a reason for Hudson to exit the vehicle. The same principle applies to Lieutenant Davidson—his alleged "awareness [that] the stop was legally questionable" is simply irrelevant to Plaintiffs' claim. Dkt. 1 ¶ 172; *see Whren*, 517 U.S. at 811–12; *Ordonez-Zometa*, 141 F.4th at 551–52.

For these reasons, Count II fails to plausibly allege a violation of Hudson's Fourth Amendment rights at any point throughout the traffic stop, and therefore, must be dismissed.

### 3. Count III: First Amendment Retaliation Against Begley, Davis, Aguirre, Mayhew, and Cheek

Count III asserts a claim under § 1983 for First Amendment retaliation against Defendants Begley, Davis, Aguirre, Mayhew, and Cheek. *See* Dkt. 1 ¶¶ 179–191. It alleges that the Plaintiffs engaged in protected First Amendment activity by filing "multiple FOIA requests," a "constitutional objection letter" to the Care Center, and by generally engaging in "an ongoing pattern of public accountability advocacy." *Id.* ¶ 181. The named Defendants allegedly took adverse action in retaliation for this activity by prosecuting Plaintiffs, imposing excessive costs to complete the FOIA requests, threatening to prohibit Hudson from making future requests, and engaging in other harassment. *See id.* ¶ 182.

To state a valid First Amendment retaliation claim, a plaintiff must establish: (1) they engaged in protected First Amendment activity; (2) the defendants took some action that adversely affected their First Amendment rights, and; (3) there is a causal connection between the protected activity and the defendant's conduct. *Snoeyenbos v. Curtis*, 60 F.4th 723, 730 (4th Cir. 2023). But where the claim alleges retaliatory prosecution specifically, plaintiffs must also plead that there was a lack of probable cause. *See Hartman v. Moore*, 547 U.S. 250, 263 (2006); *see also Nieves v. Bartlett*, 587 U.S. 391, 407 (2019) (creating a narrow exception for when "a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been" (citation omitted)). And government defendants are entitled to qualified immunity from civil damages claims unless their challenged conduct violated one of the plaintiff's clearly established constitutional rights. *E.g.*, *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

To the extent that the alleged adverse action is Plaintiffs' prosecution, the claim must be dismissed because probable cause existed to prosecute them and because they have not presented

"objective evidence" that similarly situated individuals were not prosecuted. *Id.*; *see* Dkt. 1 ¶ 182 ("Defendants took adverse action including: criminal prosecution . . . ."); *id.* ¶ 149 (acknowledging that Bolt was not vaccinated or licensed until after the charges were brought).

Plaintiffs also allege adverse action through imposing "systemic [V]FOIA obstruction" and "coordinated harassment at the February 8 Care Center visit." Dkt. ¶ 182. However, this remaining extent of Count III must be dismissed because Plaintiffs failed to allege that their activity was protected by a clearly established First Amendment right. *See id.* ¶ 181 (alleging protected activity). Plaintiffs assume that their VFOIA requests fall under the ambit of the First Amendment, but the Supreme Court "has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA law." *McBurney v. Young*, 569 U.S. 221, 232 (2013) (citations omitted); *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control."); *Fusaro v. Cogan*, 930 F.3d 241, 249–50 (4th Cir. 2019). Accordingly, some courts—though not all—have rejected that public records requests can be "protected activity" to support a First Amendment retaliation claim. *Compare Allen v. Lang*, 738 F. App'x 934, 938–40 (10th Cir. 2018), *with DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288–89 (11th Cir. 2019). The Fourth Circuit does not appear to have addressed the issue, but it has affirmed that "[t]he general rule is that of *Houchins*: there is no First Amendment right 'to government information or sources of information within the government's control.'" *Fusaro*, 930 F.3d at 250 (quoting *Houchins*, 438 U.S. at 15). Thus, it cannot be said that it was "beyond debate" that Plaintiffs engaged in protected activity by filing their VFOIA requests, and Defendants are entitled to qualified immunity on this aspect of Count III. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Further, assuming *arguendo* that Plaintiffs' "constitutional objection letter" could constitute protected activity, the alleged adverse action to that activity was the prosecution (*see* Dkt. 1 ¶¶ 129–132, 182); thus, it cannot support their claim because Plaintiffs failed to plead lack of probable cause or the *Nieves* exception. The only remaining "protected activity" identified by Plaintiffs—their "ongoing pattern of public accountability advocacy"—is far too vague to support their retaliation claim, even at this preliminary stage.

Therefore, Count III must be dismissed.

**4. Count IV: Unlawful Seizure Against Cheek, Davis, and Aguirre**

Counts IV alleges Defendants Cheek and Davis unlawfully seized Plaintiff Goodson's identification when she came to pick up Bolt at the Care Center on February 8, 2025. Dkt. ¶¶ 192–202. Because of the prior interactions between Plaintiffs and Care Center staff, Davis allegedly summoned Deputy Cheek when Goodson arrived. *See id.* ¶¶ 116–117. With Deputy Cheek beside her, Davis allegedly asked to "make a copy of" Goodson's ID. *Id.* ¶ 121. Deputy Cheek than interjected and "demanded" Goodson's ID, which Goodson provided, though allegedly under the impression that it was for "administrative purposes." *Id.* When Deputy Cheek instead began to run a warrant check with Goodson's ID, Goodson objected; Deputy Cheek responded that his request for her ID was an "order." *See id.* ¶¶ 122–124. Plaintiffs challenge Deputy Cheek's authority to demand Goodson's ID and argue that any consent to give Cheek her ID was invalid because it was obtained through deception. *See id.* ¶¶ 199–201.

Count IV rests on Plaintiffs' assertion that the Care Center encounter on February 8 was a "purely civil and administrative matter." *Id.* ¶ 194; *see also id.* ¶ 201 (describing the circumstances as a "routine dog retrieval with no criminal suspicion"). However, there was nothing "civil" or "administrative" about this interaction: Goodson arrived as the owner of an unlicensed and

unvaccinated dog in violation of state and local laws enforceable by *criminal* misdemeanor penalties. Va. Code § 3.2-6587(A). And because there was no question to Deputy Cheek that Goodson was Bolt's owner, he had probable cause to believe she was violating these laws. *See United States v. Mayberry*, 125 F.4th 132, 143 (4th Cir. 2025) (reciting the probable cause standard).

In Virginia, law enforcement officers have the authority to detain a suspect upon probable cause of a misdemeanor committed in the officer's presence. *See* Va. Code § 19.2-74(A)(1)–(2). The Fourth Amendment likewise carries this in-presence rule for misdemeanors. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). And upon seizure for a misdemeanor committed in the officer's presence, Virginia law enforcement officers have the authority—indeed, the duty—to demand the suspect's identification. *See* Va. Code § 19.2-74(A) ("the arresting officer shall take the name and address of such person and issue a summons . . . .");[12] *see also Rodriguez*, 575 U.S. at 355 (citing warrant checks as an ordinary inquiry incident to a lawful stop).

Here, Goodson appeared in the presence of Deputy Cheek while owning, keeping, holding, or harboring an unvaccinated and unlicensed dog over four months old. *See* Amherst County, Va., Code § 3-36 ("It shall be unlawful for any person to own, keep, hold or harbor any dog or cat, over the age of four (4) months, within the County unless the dog or cat shall have been vaccinated . . . with a rabies vaccine[.]"); Va. Code § 3.2-6524 ("It shall be unlawful for any person . . . to own a dog four months old or older in the Commonwealth unless such dog is licensed[.]"); *id.* § 3.2-6521. Every moment Goodson continued to own, keep, hold, or harbor this dog, she was violating state and local criminal law. *Cf. Morris v. Commonwealth*, 51 Va. App. 459, 467 (2008)

[12] Even if § 19.2-74 does not grant this authority, the Fourth Amendment does not forbid it. *See Virginia v. Moore*, 553 U.S. 164, 173, 176 (2008).

("Possession is by nature a continuing offense." (quoting *Jordan v. Virginia*, 653 F.2d 870, 875 (4th Cir. 1980), *abrogated on other grounds by* 509 U.S. 688 (1993)). Therefore, Goodson committed this misdemeanor in Deputy Cheek's presence, this fact was known to Deputy Cheek, and he properly exercised his authority to temporarily detain Goodson and obtain her ID.[13]

Accordingly, Count IV must be dismissed for failure to state a claim.

**5. Count V: Unlawful Seizure Against Cheek, Davis, and Aguirre**

Count V alleges a similar unlawful seizure claim against Defendants Davis and Aguirre for "condition[ing] the return of lawfully owned property," *i.e.*, Bolt, "on compliance with demands that lack legal authority," *i.e.*, signing the rabies form. *Id.* ¶ 204; *see also id.* ¶ 211 (including an alleged procedural due process violation). Count V rests on a similar premise that Defendants "lack[ed] legal authority" to condition the release of Bolt on Goodson's assent to a compliance agreement. *See id.* ¶ 204.[14] Because Defendants retained Goodson's personal property without legal authority, Goodson says, she suffered a violation of both her Fourth Amendment and due process rights. *See id.* ¶¶ 204, 211.

Plaintiffs fail to allege a Fourth Amendment violation because the seizure of Goodson's property was reasonable. Bolt came into the possession of the Care Center after he was found by a citizen roaming the streets at night. *See id.* ¶ 114. Due to his prior impoundments, the Care Center

[13] Plaintiffs' argument that Goodson's consent was "procured through deception" (Dkt. 1 ¶ 199) is irrelevant to this Fourth Amendment analysis, because the existence of probable cause independently justified the seizure regardless of whether Goodson consented.

[14] This premise is based on a construction of state law—that "the authority to order confiscation of a dog" is vested "solely in the judiciary, and only upon conviction." Dkt. ¶ 207 (citing Va. Code § 3.2-6587(A)(2)). That construction is incorrect: The "sole" authority to order a confiscation is not vested in the judiciary and does not require a conviction. The cited provision classifies the failure to pay a pet-license tax as a Class 4 misdemeanor, and provides that, "*[i]n addition*, the court may order confiscation." Va. Code § 3.2-6587(A)(2) (emphasis added). Other provisions require municipalities to "confine" or "capture" pets found roaming at large. *E.g.*, *id.* §§ 3.2-6546(C), 3.2-6562.

officials knew of Bolt's unvaccinated status and Plaintiffs' ardent refusal to comply with the law. *See id.* ¶¶ 109–112. There is nothing unreasonable or extraordinary about requiring Goodson to promise to follow the rules before releasing Bolt—in fact, Defendants could have done much more. *See* Va. Code § 3.2-6546(C) (granting animal shelter officials the authority to vaccinate impounded dogs); Amherst County, Va., Code § 3-38(b) ("[An impounded] dog or cat may be returned to its owner upon proof of ownership, vaccination, and payment of the cost of impoundment.").

Plaintiffs also fail to allege a violation of Goodson's procedural due process rights. To succeed on a procedural due process claim, a plaintiff must: (1) identify a protected liberty or property interest; (2) demonstrate that he was deprived of that interest; and (3) show that the procedures employed by the defendant to deprive him of that interest were constitutionally inadequate. *See, e.g.*, *Palmer v. City Nat'l Bank of W. Va.*, 498 F.3d 236, 248 (4th Cir. 2007). Plaintiffs have alleged sufficient facts to establish the first two elements, but not the third; that is, they failed to establish that the Defendants used constitutionally deficient process in refusing to release Bolt outright. Analyzing the facts under the three-factor standard of *Mathews v. Eldridge*, there is little doubt that: (1) Plaintiffs' interest in being permitted to continue violating the law is non-existent; (2) the risk of erroneous deprivation and the probable value of additional procedural safeguards is low, given the comprehensive regulatory scheme that already exists; and (3) the government's interest in being able to enforce its health and safety regulations is significant. *See* *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

Count V therefore fails to state a claim on which relief can be granted.

### 6. Count VI: Violation of VFOIA Against Begley and Aguirre

Count VI asserts a state law claim under VFOIA. *See* Dkt. 1 ¶¶ 212–219. Because "[n]eedless decisions of state law should be avoided," and because the Court is dismissing all of

Plaintiffs' federal claims, the Court shall decline to exercise jurisdiction over this claim. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *accord Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024); 28 U.S.C. § 1367(c).

Therefore, Count VI shall be dismissed without prejudice, giving Plaintiffs the ability to pursue this claim in state court.

**7. Count VII: First Amendment Claims Against Begley, Davis, Aguirre, Mayhew, and Cheek**

Count VII—which alleges an obstruction of the First Amendment right to petition based entirely on Defendants' handling of Plaintiffs' VFOIA requests, *see* Dkt. 1 ¶¶ 220–225—is duplicative of Count III and must be dismissed for the same reasons.

**8. Count VIII: Prospective Injunctive Relief Against Ayers**

Count VIII asserts a claim for prospective injunctive relief for alleged "systemic constitutional violations" by the Amherst County Sheriff's Office, naming the Sheriff in his official capacity. *See* Dkt. 1 ¶¶ 226–231. Plaintiffs list five allegedly ongoing constitutional violations that are attributable to the official policy of the Sheriff's Office: (1) traffic stops of farm use vehicles without reasonable suspicion; (2) unconstitutional identification demands; (3) obstructions of petitioning rights; (4) retaliatory enforcement against citizens seeking government accountability, and; (5) the lack of operational separation at the Care Center. *See id.* ¶ 229. Sheriff Ayers moved to dismiss Count VIII for lack of standing. *See* Dkt. 10 at 14–15; Fed. R. Civ. P. 12(b)(1).

Article III of the U.S. Constitution requires all plaintiffs to demonstrate three fundamental elements before a federal court can exercise jurisdiction over their claims: (1) injury-in-fact, (2) causation, and (3) redressability. *E.g.*, *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 378–85 (2024). To establish standing to seek prospective remedies, like an injunction, a plaintiff "must

establish an ongoing or future injury in fact." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)); *see also Kenny*, 885 F.3d at 287 (stating that an alleged future injury must be "certainly impending" or have a "substantial risk" of occurring to suffice (quotation omitted)).

Here, Plaintiffs' lack standing to seek injunctive relief because their allegations of systemic unconstitutional conduct are based entirely on either their past encounters with the County or sweeping and conclusory statements. *See O'Shea*, 414 U.S. at 495–96 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."); *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016) ("[T]o survive a motion to dismiss for lack of standing, a plaintiff 'must allege facts that affirmatively and plausibly suggest that it has standing to sue.'" (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).

Plaintiffs have put forth zero credible facts to suggest that they are being harmed or will imminently be harmed by any of the challenged conduct. First, as support for their conclusion that "farm use vehicle operators throughout Amherst County" will continue to suffer Fourth Amendment violations, Plaintiffs cite only Hudson's 2024 stop and the 2022 stop of another person. *See* Dkt. 1 ¶ 229(a). As to the alleged ongoing unconstitutional identification demands, Plaintiffs only discuss Goodson's 2025 encounter at the Care Center and Hudson's 2024 traffic stop. *Id.* ¶ 225(b). The same is true for the three other alleged "systemic" violations—the only facts that are separate from Plaintiffs' past encounters with the County are conclusory assertions that fail to demonstrate any ongoing or future injury-in-fact. *See id.* ¶¶ 229(c)–(e). The Court cannot accept these allegations "labeled as fact but that constitute nothing more than 'legal

conclusions' or 'naked assertions.'" *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013) (internal quotation omitted).

Because Plaintiffs have failed to establish their standing to demand prospective relief, Count VIII must be dismissed for lack of subject matter jurisdiction.

#### 9. Count IX: § 1983 claim against Amherst County

Count IX asserts an additional due process claim for the County's allegedly "unauthorized penal scheme" and "failure to provide meaningful notice." *Id.* ¶¶ 235, 238. Plaintiffs allege that the Due Process Clause "requires that criminal penalties be authorized by law," and therefore, because the County's pet vaccine and licensing penalties "exceed[] those authorized by the state legislature," their prosecution under those ordinances unconstitutionally deprived them of their liberty. *Id.* ¶ 233. Additionally, Plaintiffs allege that, because the Due Process Clause "requires that penal statutes provide sufficient notice," the County's insufficient efforts to disclose or publicize the Class 1 penalties also violated Plaintiffs' due process rights. *See id.* ¶¶ 233, 238.

Count IX is duplicative of Count I and will be dismissed for the same reasons. *See* Part III.1, *supra*.[15]

---

[15] Count IX could be read to assert a unique void-for-vagueness challenge to the County ordinances. *See, e.g.*, Dkt. 1 ¶ 238 (challenging the County's "failure to provide meaningful notice" of the Class 1 penalties); *Lytle v. Brewer*, 73 F. Supp. 2d 615, 627 (E.D. Va. 1999) ("If either lack of notice to ordinary citizens as to what conduct is illegal, or arbitrary enforcement is risked in a statute, it is considered void for vagueness." (citing *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)). However, Plaintiffs expressly disclaimed that Count IX asserts a void-for-vagueness claim in their supplemental briefing on the County's Motion to Dismiss. *See* Dkt. 31 at 9–12. Instead, Plaintiffs described the "gravamen" of Count IX as "a locality deprives a citizen of liberty without due process of law when it prosecutes that citizen under criminal penalties it had no authority to enact." *Id.* at 10. The Court will not construe Count IX to assert a voidness claim that, by "express and explicit indication," Plaintiffs do not intend to pursue. *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84 (4th Cir. 2018) (quotation omitted); *see also Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) ("[L]iberal construction does not require us to attempt to discern the unexpressed intent of

**10. Count X: Malicious Prosecution Against Aguirre, Davis, and Mayhew**

Count X asserts a claim for malicious prosecution against Defendants Aguirre, Davis, and Mayhew. Dkt. 1 ¶¶ 240–246. To state a claim for malicious prosecution under § 1983, a plaintiff must establish that: "(1) the defendant initiated or maintained charges against the defendant; (2) the proceedings terminated favorably to the plaintiff; (3) lack of probable cause to support the charges; and (4) the defendant's malice or ill will towards the defendant." *Neal v. Alleghany Cnty. Cir. Ct.*, 2026 WL 417722, at *1 (W.D. Va. Feb. 13, 2026) (footnote omitted) (citing *Lambert v. Williams*, 223 F.3d 257, 260 (4th Cir. 2000)).

Plaintiffs advance three theories of why the charges against them lacked probable cause. First, because the ordinances were invalid under state law; second, because at the time the charges were filed (March 13–14, 2025) Plaintiffs did not have possession of Bolt; and third, because the overall circumstances show that the motivation for the charges was retaliation, not probable cause. *See* Dkt. 1 ¶ 244.

Each of Plaintiffs' theories is flawed. First, as already discussed, the County ordinances being invalid under state law is irrelevant to whether probable cause existed. *See, e.g.*, *Michigan v. DeFillippo*, 443 U.S. 31, 39–40 (1979). Second, that Plaintiffs did not have possession of Bolt the very moment they were served with the summons is likewise irrelevant to probable cause—the charges were not specific to any period of time, and by Plaintiffs' own admission, they were in continuing non-compliance until April 7, 2025. *See* Dkt. 1 ¶¶ 131–132, 149. Third, Defendants' alleged subjective motivation for bringing the charges is again irrelevant to the issue of probable

---

the plaintiff, but only to determine the actual meaning of the words used in the complaint." (internal quotation omitted)).

cause. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

For these reasons, Count X will also be dismissed.

## IV. CONCLUSION

The Defendants' motions to dismiss (Dkt. 9; Dkt. 23; Dkt. 26) will be **GRANTED**. Counts I, II, III, IV, V, VII, IX, and X shall be **DISMISSED WITH PREJUDICE**. Counts VI and VIII shall be **DISMISSED WITHOUT PREJUDICE**.

The Clerk of Court is directed to send a copy of this memorandum opinion and order to Plaintiffs and all counsel of record. This case shall be closed and removed from the Court's active docket.

It is **SO ORDERED.**

Entered this 30th day of September, 2026.

Norman K Moon

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE